# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **JOSE A. RIVERA-PINA, et al.,**<br><br>**Plaintiff,**<br><br>v.<br><br>**LUXURY HOTELS INTERNATIONAL OF PUERTO RICO D/B/A RITZ-CARLTON HOTEL SPA & CASINO,**<br><br>**Defendant.** | **CIVIL NO. 18-1719 (PAD)** |

## OPINION AND ORDER

Delgado-Hernández, District Judge.

Plaintiffs, 154 former employees of Luxury Hotels International of Puerto Rico, Inc. d/b/a The Ritz-Carlton San Juan Hotel, Spa & Casino, sued Ritz-Carlton after being discharged following the hotel's closing in the aftermath of Hurricanes Irma and Maria in September 2017. Claiming that the discharges were unjust, discriminatory, a pretext to provide lower benefits and without sufficient advance notice of termination, they initiated this action under the Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101, et seq., ("WARN Act") and Puerto Rico law (Docket No. 1, Exhibit 1).[1]  Before the court is defendant's "Motion for Summary Judgment" (Docket No. 86) and plaintiffs' "Motion to Strike Exhibit of Defendant's Proposed Statement of Uncontested Facts" (Docket No. 92).  For the reasons explained below, the motion for summary judgment is GRANTED, the motion to strike defendant's exhibits DENIED, and the case DISMISSED.

---

[1] Specifically, Puerto Rico's Unjust Discharge Act, Law 80 of May 30, 1976, as amended, P.R. Laws Ann. Tit. 29, § 185a et seq., (Law 80"); Puerto Rico's general discrimination statute, Law 100 of June 30, 1959, as amended, P.R. Laws Ann. Tit. 29, § 146 et seq., ("Law 100"); and the Puerto Rico Puerto Rico Labor Transformation and Flexibilization Act, Law No. 4 of January 26, 2017, P.R. Laws Ann. Tit. 29, § 121 et seq., ("LTFA").

Rivera-Pina v. Luxury Hotels International of Puerto Rico
Civil No. 18-1719 (PAD)
Opinion and Order
Page 2

## I.     SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). It is "material" if it potentially affects the outcome of the suit under governing law. Id.

All reasonable factual inferences must be drawn in favor of the party against whom summary judgment is sought. See, Shafmaster v. U.S., 707 F.3d 130, 135 (1st Cir. 2013)(so noting). To resist summary judgment, however, the nonmovant must do more than show some metaphysical doubt as to a material fact. See, Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)(articulating proposition). Conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative, do "not suffice to ward off a properly supported summary judgment motion." Nieves-Romero v. U.S., 715 F.3d 375, 378 (1st Cir. 2013).

## II.     FINDINGS OF FACT

### A.  Preliminary Observations

Except otherwise noted, the facts included in this section are drawn from the well-pleaded facts asserted in the complaint (Docket No. 1, Exhibit 1) and the parties' Local Rule 56 submissions (Docket Nos. 86, 87, 92, 93, 103, 104 106 and 110). Local Rule 56 is designed to "relieve the district court of any responsibility to ferret through the record to discern whether any material fact is genuinely in dispute." CMI Capital Market Inv. v. González-Toro, 520 F.3d 58, 62 (1st Cir. 2008).

Rivera-Pina v. Luxury Hotels International of Puerto Rico
Civil No. 18-1719 (PAD)
Opinion and Order
Page 3

It requires a party moving for summary judgment to accompany its motion with a brief statement of

facts, set forth in numbered paragraphs and supported by specific citations to the record, that the

movant contends are uncontested and material.  Local Rule 56(b) and (e).  The opposing party must

admit, deny, or qualify those facts, with record support, paragraph by paragraph.  Id. 56(c) and (e).

While the district court may "forgive" a violation of Local Rule 56, litigants who ignore the rule do

so "at their peril."  Mariani-Colón v. Dep't of Homeland Sec. ex rel. Chertoff, 511 F.3d 216, 219

(1st Cir. 2007).  Here, the court has reviewed every factual statement and counterstatement that the

parties submitted, and it has included in this Opinion and Order only those facts that are material to

the case and that were incorporated in statements that comport with summary judgment principles.

**B. The Parties**

   Plaintiffs are 154 former Ritz-Carlton employees.  See, "Second Modified Joint Partial

Statement of Uncontested Facts" ("Joint SUMF") (Docket No. 73) at ¶ 72.[2]  Until September 20,

---

[2] The following observations are in order: (1) plaintiffs agree with most facts, admitting statements 1-242, 246-249, 251, 256-261, 299-302, 304, 306-307, 320-323, 326, 328, 339, 832, 841, and 842 of Ritz-Carlton's "Statement of Uncontested Facts in Support of Defendant's Motion for Summary Judgment" (Docket No. 87)("SUMF").  To that effect, see, plaintiffs' "Opposition Statement of Material Facts" (Docket No. 93) ("OSUMF").  (2) plaintiffs further admit statements 340-831, 834-840 and 843-849 of Ritz-Carlton's SUMF, "insofar they expressed deposed plaintiffs statements during their respective depositions.  However the majority of their testimony used by defendant is inadmissible, are impressions and speculation by them and should not be considered for purposes of the motion for summary judgment."  See, OSUMF (Docket No. 93) at ¶¶ 103, 106 and 109.  This barebones conclusory statement is unpersuasive.  As explained in Section III-A of this Opinion and Order, the court can consider evidence at summary judgment stage as long as it can be presented in an admissible form at trial.  Plaintiffs have not shown that this is not the case.  Hence, the court deems admitted statements 340-831, 834-840 and 843-849.  (3) Plaintiffs qualify statements 252-254, 264-274, 303 and 305 of Ritz-Carlton's SUMF, by noting that those facts are based on what deponents "saw."  OSUMF (Docket No. 93) at ¶¶ 33-35, 45-55, 66 and 68.  Plaintiffs do not point to any evidence to demonstrate that these facts are false or inadmissible.  Additionally, the court struggles to understand plaintiffs' qualification as to "seeing" something, for it is unequivocal support of having personal knowledge.  Thus, the court deems admitted statements 252-254, 264-274, 303 and 305.  (4) Plaintiffs deny statements 244, 276-279, 280-298, 324-325, 329, 331-338 and 833 of Ritz-Carlton's SUMF, and ask the court to strike them from the record.  See, OSUMF (Docket No. 93) at ¶¶ 25, 57-61, 87-88, 94-101 and 105.  For the reasons stated in Section III-A of this Opinion and Order, those statements are deemed admitted.  (5) Plaintiffs deny statements 309-312 of Ritz-Carlton's SUMF, alleging that "even though the employees received a letter on that date on November 2017 with the title Warn Act, the defendant recognized that said notification was not a termination and/or shutdown, therefore cannot be considered a notification under the A[ct]."  See, OSUMF (Docket No. 93) at ¶¶ 72-75.  Plaintiffs' objection is unclear at best.  The WARN Act does not exclusively apply to "termination[s] and/or shutdown[s]" as the law makes clear that advance notice is necessary in other situations, such as "plant closings" and "mass layoffs."  29 U.S.C. § 2101.  Even though, as discussed below,

Rivera-Pina v. Luxury Hotels International of Puerto Rico
Civil No. 18-1719 (PAD)
Opinion and Order
Page 4

2017, Ritz-Carlton operated a hotel with a spa, casino and restaurants, centered on its guests and clients.  See, Joint SUMF (Docket No. 73) at ¶¶ 13-14.  Plaintiffs performed the duties set forth in their job descriptions within the physical premises of the hotel.  Id. at ¶ 16.  Those duties were related to and in connection with the services that Ritz-Carlton offered to its guests.  Id. at ¶ 17.  Up to September 2017, Ritz-Carlton employed approximately 700 employees.  See, SUMF (Docket No. 87) at ¶ 161.

### C.  Hurricanes Irma and Maria

On September 6, 2017, Hurricane Irma struck Puerto Rico.  See, Joint SUMF (Docket No. 73) at ¶ 1.  As a result, the hotel suffered damages including water filtering into the hotel's lobby from side doors, water leakages, and debris.  See, SUMF (Docket No. 87) at ¶ 243.[3]  Additionally, the gate near the tennis court and the Caracoles area were extremely damaged and it was not clear whether they would hold up during the next hurricane.  Id. at ¶ 244.

On September 19 and 20, 2017, Hurricane Maria struck Puerto Rico.  See, Joint SUMF (Docket No. 73) at ¶ 1.  Jacqueline Volkart was Ritz-Carlton's General Manager from April 2014 to October 7, 2017.  See, SUMF (Docket No. 87) at ¶ 155.  She was staying at the hotel when Hurricane Maria struck the Island.  Id. at ¶ 247.  After the storm passed, she walked the premises, although not in their entirety.  Still, she saw that there was "a lot of sand everywhere, a lot of landscaping damages, and the tennis courts and the roof were severely damaged."  Id. at ¶¶ 251-252.  Ms. Volkart also walked around the interior of the property and noticed that "the club lounge was severely damaged

WARN notices were not necessary in this case, they were still given.  The court agrees with defendant's position at Docket No. 106, p. 13, and thus deems admitted statements 309-312.

[3] Plaintiffs contest this fact, stating that it is not supported by Ms. Villapol's deposition, who "recognized that she did not see [the water leakage] with her own eyes."  OSUMF (Docket No. 93) at ¶ 24.  Plaintiffs' argument is unpersuasive, as Ms. Villapol stated that she saw the water on the floor.  Ms. Villapol has personal knowledge of this fact – whether she saw the leaking occurring in real time or not is irrelevant.

(it was totally demolished), the rooms next to it were in very bad shape, there was a lot of damage and water especially in the high floors because they were closer to the roof, there was water everywhere, and there were broken windows." Id. at ¶ 253. Further, she saw great amounts of water leaking from the casino roof, noticed that the casino's carpet was wet, and that there were openings in the ceiling and broken windows. Id. at ¶ 254.

Mr. Jay Anthony Galindo held the position of Senior Regional Security Director, Caribbean and Latin America, at Marriott International Administrative Services, Inc. See, SUMF (Docket No. 87) at ¶ 164. His position entails overseeing the safety and security of all the guests and associates that are at the Marriott properties, which includes the Ritz-Carlton. Id. He handles the regional crisis planning and crisis preparedness and coordinates crisis response. Id. at ¶ 165. He visited the hotel after Hurricane Maria to assess the condition of the property. Id. at ¶¶ 258-259. He described what he saw in the hotel as "the worst catastrophe that [he has] ever been involved in."[4] Id. at ¶ 263.

Mr. Galindo noticed that sand had overtaken the whole back area of the hotel, the swimming pool was full of sand, there were shattered windows, and the property was generally disheveled. See, SUMF (Docket No. 87) at ¶ 265. He observed that, in the hotel's interior, there was a significant amount of water coming from the upper floors and "it was like stepping on a sponge with the water coming out from under his shoes." Id. at ¶ 266. Also, he observed that there were broken windows, the gymnasium and other hotel areas had some water filtration, and there was a moldy smell throughout the rooms, which forced him to move to three different rooms. Id. at ¶¶ 267-271. Furthermore, he "saw mold setting in the upper floors of the hotel during his initial walkthrough. It was stuck on the floor in some areas. The walls were getting a kind of greenish mold, like a wet

---

[4] This fact is deemed admitted, despite plaintiffs' denial. It is clear from Mr. Galindo's deposition that he was referring to his impression of the damages to the Ritz-Carlton, rather than the island of Puerto Rico as a whole. Plaintiffs do not cite any evidence to successfully contradict this statement.

look. Everything was wet and the smell was just getting stronger each day. It was beyond a humidity smell." Id. at ¶ 274.

At the time of Hurricane Maria, Mr. Steve Contos was "Senior Vice President – Caribbean & Luxury Portfolio Latin America" and Ms. Volkart's direct supervisor. See, SUMF (Docket No. 87) at ¶ 157. Mr. Contos stayed at the Ritz-Carlton from September 30, 2017 to October 1, 2017. Id. at ¶ 276. The rooms at the hotel were classified into four categories: A (room was okay at the time of inspection), B (room had elevated moisture and odor during the time of inspection), C (room needs substantial drywall demolition and cuts around windows/exterior doors/interior walls), and D (room needs complete demolition or more than 50 percent of the entire room demolition). Id. at ¶ 277. By October 1, 2017, the majority of the rooms were classified as C or D. Id. at ¶ 278. Mr. Contos stayed in a room classified as B, which he described as not acceptable for human occupation. Id. at ¶ 279.

On September 20, 2017, the Ritz-Carlton closed and has not reopened. See, Joint SUMF (Docket No. 73) at ¶¶ 5-6. As a consequence of the impact of Hurricanes Irma and Maria, many Ritz-Carlton employees were laid off. See, SUMF (Docket No. 87) at ¶ 245.[5] After Hurricane Maria, the last guest left the hotel around October 4 or 5, 2017. Id. at ¶ 250 [6]

---

[5] Plaintiffs qualified this fact by stating: "To support this proposed fact the defendant cites Mrs. Villapol deposition. In said deposition she clarified she was repeating the contents of the letter notified to the employees on [sic] March 2018 that stated that they were been laid off allegedly because of the damages suffered by the Hotel by Hurricane Irma and Maria. Mrs. Villapol even recognized that she signed the termination letter of the employees on March 2018 she did not prepare it." Ms. Villapol indeed stated that the layoffs occurred due to the hurricanes. See, SUMF (Docket No. 87), Exhibit 72, at p. 74. Plaintiffs have not cited any evidence to effectively contradict the veracity of this statement, so the statement is deemed admitted.

[6] Plaintiffs deny this statement with irrelevant and unresponsive language: "Mr. Jay Galindo Head of Security testified in his deposition that during his stay at the Hotel in October 2017, the were personnel from FEMA, Homeland Security, and Pinkerton Security staying as guest at the Hotel." See, OSUMF (Docket No. 93) at ¶ 31. Plaintiffs' denial and the evidence they cite to do not mention October nor any other date. Additionally, plaintiffs are referring to first responders who are not considered "guests" of a hotel. Accordingly, they did not appropriately controvert this statement and, thus, the statement is deemed admitted.

### D.  **DBI Report Assessing Hotel Damages**

On October 17, 2017, DBI Construction Consultants prepared a report and addressed it to David Buck, an insurance adjuster.  See, SUMF (Docket No. 87) at ¶ 281.  The report revealed, *inter alia*, that site and grounds of the hotel suffered significant damage due to Hurricane Maria.  Significant portions of the trees, ground plants, site lighting, and audio systems had been impacted by the hurricane.  Id. at ¶¶ 282-283.  The plexi-glass fencing at the rear exit and painted aluminum perimeter fencing were significantly damaged.  Id. at ¶ 285.  The exterior painted stucco cladding on the main buildings suffered wind, water intrusion, and debris impact damage that will require repair and recoating of the entire complex.  Id. at ¶ 286.  The terra cotta roofing tiles suffered severe wind damage as a result of Hurricane Maria.  Id. at ¶ 287.

About 25% of the exterior windows had suffered debris impact damage or had moisture accumulation between the exterior and interior panes.  See, SUMF (Docket No. 87) at ¶ 288.  As of the date of the report (October 17, 2017), moisture readings for all 416 guest rooms had been performed and completed.  Id. at ¶ 289.  The results showed about 10% of rooms with no elevated moisture levels, about 20% of rooms with slightly elevated moisture level, and about 70% of rooms that had moisture levels significantly elevated and would require the removal of wetted materials in order to reduce the potential for microbial growth.  Id. at ¶ 290.  As to the hotel's casino, its roof damage was consistent with the hotel's roof damage.  Id.  at ¶ 291.  The casino had isolated interior water leaks, which in turn leaked into the second-floor storage area and then dripped onto the gaming floor.  Id.   There was also another leak that came from a mechanical system on the second floor above the main entrance.  Id. at ¶ 291.

One of the three main generators located in the tower level suffered damage to the extent of requiring replacement.  See, SUMF (Docket No. 87) at ¶ 292.  The unit replacement would require

removing and replacing a portion of the concrete masonry unite wall for access.  Id.  The Ocean Bar & Grill structure suffered significant wind and water damage that would require replacement of the exterior bar components, as well as significant repairs to the interior spaces.  Id. at ¶ 293.  The La Vista Terrace pavilion structure suffered severe damage to the ceiling finishes, significant damage to steel faux barrel tile roofing, and visible structural steel damage.  At that point, replacement of the full structure seemed to be the most economical option.  Id. at ¶ 294.

Furthermore, the HVAC system of the hotel was not operating at full capacity due to damage to the two chillers and rooftop cooling towers caused by Hurricane Maria and the hotel's drainage system was not functioning properly.  See, SUMF (Docket No. 87) at ¶¶ 296-297.  A microscopic analysis of air samples taken on November 2017 showed that, in a substantial amount of guest rooms, the indoor air's concentration of spores and diversification of genus was higher than that of the outdoor air, despite the fact that concentrations and composition for indoor environments should be equal to or less than concentrations and composition for the outdoor air.  Id. at ¶ 298.

### E.  Closing the Ritz-Carlton and Terminating Plaintiffs' Employment

Due to the damages caused by the hurricanes, Mr. Galindo recommended to Mr. Contos that the hotel be closed, as he deemed that there were portions of the property that were uninhabitable and getting progressively worse.  See, SUMF (Docket No. 87) at ¶¶ 303-305.  A few days after Mr. Galindo left Puerto Rico, Mr. Contos notified him that the hotel would remain closed.  Id. at ¶ 307.

On October 7, 2017, a general assembly for all Ritz-Carlton employees was held at the hotel and Ms. Volkart, Ms. Villapol, and others, addressed the employees.  See, Joint SUMF (Docket No. 73) at ¶¶ 29-32.  At the time, the employees were told that if the hotel re-opened and they were rehired, the hotel would honor their seniority and benefits.  See, SUMF (Docket No. 87) at ¶ 328. On November 17, 2017, plaintiffs received a notice under the WARN Act, stating that they were

Rivera-Pina v. Luxury Hotels International of Puerto Rico
Civil No. 18-1719 (PAD)
Opinion and Order
Page 9

being laid off effective October 6, 2017, due to the closure of the hotel as a consequence of damages

caused by Hurricanes Irma and Maria; the layoffs would remain in effect as Ritz-Carlton continued

evaluating the extent of the damages caused by the hurricanes and until it was able to determine

when the hotel would reopen and continue with its normal operations.  Id. at ¶¶ 309-312.[7]

On March 19, 2018, a conference call – which the majority of plaintiffs attended or heard a

recording of – was held for all Ritz-Carlton employees.  See, Joint SUMF (Docket No. 73) at ¶¶ 34-

35.  During this call, plaintiffs were informed that their employment would be terminated effective

April 30, 2018.  See, SUMF at ¶ 329.  Plaintiffs were also informed that if they came back to work

after the hotel's reopening, their original employment start date would be honored and they would

not undergo a probationary period.  Id. at ¶ 330.  Between March 19-20, 2018, Ritz-Carlton sent a

WARN Act notice letter which all of plaintiffs received.  See, Joint SUMF (Docket No. 73) at ¶¶

36-38 and Exhibit 1.  The letter informed them of their employment termination effective April 30,

2018, as a result of damages suffered by the hotel as a consequence of Hurricanes Irma and Maria;

and that Ritz-Carlton had not determined when it would reopen to the public.[8]  See, SUMF (Docket

No. 87) at ¶ 316.[9]

Ms. Anneliesse Cooper, Senior Area Director of Human Resources at Marriott International

Administrative Services, Inc., had recommended the decision to terminate plaintiffs' employment to

Mr. Contos, who ultimately approved that decision.  Ms. Cooper's recommendation to Mr. Contos

was based on the fact that the hotel was still closed, and they did not have a timeframe for reopening.

---

[7] A copy is included as Appendix I.

[8] A copy of the letter is included as Appendix II.

[9] Plaintiffs qualified this statement by noting that "Cooper made clear that the termination of the employees was in
the notification they received on March 19, 2018."  See, OSUMF (Docket No. 73) at ¶ 79.  This qualification does not
contradict the fact and, as such, the fact is deemed admitted.

Rivera-Pina v. Luxury Hotels International of Puerto Rico
Civil No. 18-1719 (PAD)
Opinion and Order
Page 10

See, SUMF (Docket No. 87) at ¶¶ 162, 320-323.   Seniority was followed in the employment

terminations within all of the hotel's departments.   Id. at ¶¶ 324-325.

    The Ritz-Carlton paid all plaintiffs for 32 hours of work per week from September 20, 2017

until December 14, 2017.   See, Joint SUMF (Docket No. 73) at ¶ 24.   If plaintiffs had any accrued

vacation leave balance by September 20, 2017, it was added to the 32 hours in order to complete a

payment of 40 hours per week, until their accrued balance was used in its entirety.   Id. at ¶ 25.

Plaintiffs did not work for those 32 hours for which they received pay.   Employees who performed

some limited work were paid separately.   Id. at ¶ 26.   On April 12, 2018, plaintiffs received a

voluntary payment in the amount of $1,000.   Id. at ¶ 27.   Plaintiffs were also provided health

insurance coverage until March 31, 2018.   Id. at ¶ 28.   A total of 584 employees (including plaintiffs)

were terminated from employment effective April 30, 2018, in terminations that affected employees

all age groups, ranging from 20 to 80 years' old.   See, SUMF (Docket No. 87) at ¶ 833.

    By November 20, 2019, Ms. Villapol only had 15 employees under her supervision.   See,

SUMF (Docket No. 87) 336.   These 15 employees work in different areas, such as Engineering,

Finance, Loss Prevention, Purchasing, Kitchen, Casino, and Systems.   See, SUMF (Docket No.

87) at ¶ 337.[10]   One of them, the Property Systems Manager, Juan Rosado, started in May 2018,

while the other 14 employees started at different times long before the hurricanes.   Id. at ¶ 338.

No other employee has been hired by Ritz-Carlton since plaintiffs' discharge.   Id. at ¶ 333.   None

of the remaining employees is less senior than the plaintiffs who were let go in their occupational

classifications.   Ritz-Carlton has not hired any employee to replace them.   Id. at ¶ 333.

---

[10] For a full list, see, SUMF (Docket No. 87) at ¶ 332.

## III.    DISCUSSION

### A.  Plaintiffs' Motion to Strike

Plaintiffs filed a motion to strike two of Ritz-Carlton's exhibits (Docket No. 92).  The two exhibits are (1) selected portions of defendant's supplemental production of documents from November 6, 2020 (Docket No. 87, Exhibit 229) and (2) a written report on the damages suffered by the Ritz-Carlton after Hurricanes Irma and Maria (Docket No. 87, Exhibit 233).  Plaintiffs contend that the court should strike these two exhibits because (1) the documents were not properly authenticated; (2) they are hearsay, and the business records hearsay exception does not apply; and (3) defendant did not comply with Fed.R.Civ.P. 30(b)(6).

#### 1.  Authentication

Plaintiffs rely on pre-2010 amendments to the Federal Rules of Civil Procedure to argue that defendant was required to authenticate the exhibits by affidavit (Docket No. 92, p.2).  Before 2010, Fed.R.Civ.P. 56(e) provided that "[i]f a paper or part of a paper is referred to in an affidavit, a sworn or certified copy must be attached to or served with the affidavit."  See also, Foreword Magazine, Inc. v. OverDrive, Inc., WL 5169384, *1 (W.D.Mich. Oct. 31, 2011) ("Former Rule 56(e) contained an unequivocal direction that documents presented in connection with a summary judgment motion must be authenticated").  The 2010 amendments removed this language.

After the 2010 amendments, Fed.R.Civ.P. 56(c)(1) states that a party must support its assertions of fact or dispute by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed.R.Civ.P. 56(c)(1).  And "a party may object that the material cited to support

or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ.

P. 56(c)(2).

As it stands, the rule now "makes no such affirmative [authentication] requirement, placing upon the adverse party the burden to raise an objection" that the evidence or fact cannot be presented in a form that would be admissible at trial. Int'l Shipping Agency, Inc. v. Union de Trabajadores de Muelles Local, 2015 WL 5022794, *3 (D.P.R. Aug. 21, 2015). The objecting party must therefore specify the proper grounds for which the opposing party's statement will not be able to be presented in a form that would be admissible at trial. "A plain objection simply stating that the exhibit proffered has not been properly authenticated will not suffice." Gonzalez-Bermudez v. Abbot Lab'ys PR Inc., 214 F.Supp.3d, 130, 137 (D.P.R. 2016) (citing Int'l Shipping Agency, Inc., 2015 WL 5022794, *3)("Because [plaintiff] makes no argument that the defendants' evidence could not be authenticated, its objection should be denied").

Here, plaintiffs have not specified how the exhibits they object to would not be able to be presented in an admissible form at trial. As discussed above, a plain objection simply stating that defendant has not properly authenticated Exhibits 229 and 233 will not suffice. The court agrees with defendant's position that these documents are part of the record: Exhibit 229 is within Ms. Volkart's personal knowledge and Exhibit 233 includes information about the individual who prepared the report (Docket No. 104). What is more, defendant responded to plaintiffs' objection by filing an authentication affidavit. See, Int'l Shipping Agency, Inc., 2015 WL 5022794, *2 (noting that "the proponent defeated the objection by filing authentication affidavits"). Plaintiffs never argued that Exhibits 229 and 233 could not be authenticated at trial and there is no evidence in the record to support such assumption.

### 2. **Hearsay**

Plaintiffs argue that Exhibits 229 and 233 "constitute hearsay evidence" and request that they be stricken (Docket No. 92, p. 3).   Additionally – and without providing any color or explaining the reason behind such conclusory statement – they state that these documents are not covered by the Fed.R.Evid. R. 803(6) business records hearsay exception.  Id.  Again, as mentioned earlier, plaintiffs have not argued that these exhibits could not be presented in an admissible form at trial.  Additionally, the business records hearsay exception applies to Exhibits 229 and 233.  The court agrees with defendant's description of Exhibit 229.  It consists of:

> (1) email correspondence to and from the company's emergency providers (fuel, cleaning chemicals, etc.); (2) continuous feedback about the weather conditions and events related to the hurricanes as they happened; communications to and from the Puerto Rico Tourism Company pertaining to Hurricane Maria and its aftermath; (3) communications on cleaning efforts; (4) information on the remaining hotel's guests; (5) assistance requests from other properties during the emergency; (6) information on the status of available flights for the remaining guests; (7) feedback from Volkart on the conditions of the property after Hurricane Maria; (8) pictures of the conditions of the property during and after Hurricane Maria sent by Volkart; (9) communications to and from Volkart pertaining to the rejection of lodging requests; (10) communications to and from Volkart regarding calls pertaining to updates and support post-hurricane Maria; (11) communications to and from Interstate Restoration regarding hotel inspection after the hurricane; (12) communications to and from Steve Contos pertaining to hotel inspection after the hurricane; and (13) other relevant communications and documentation.

See, Docket No. 104, at p. 5); Docket No. 87, Exhibit 229.  Thus, Exhibit 229 is admissible under Rule 803(6), which reads:

> Records of regularly conducted activity.   A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.  The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

The information contained in Exhibit 229 is a compilation of acts, events, conditions, opinions or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge (i.e., Ms. Volkart, the General Manager of Ritz-Carlton).  This information was kept in the course of a regularly conducted business activity –that is, as a manager, Ms. Volkart had to assess and report on the condition of the Ritz-Carlton after a natural disaster.  It should surprise no one that Ritz-Carlton had indeed instituted a regular practice to make these reports or data compilation after any hurricane hit Puerto Rico, an island prone to such natural disasters.  And the documents are from only a few days and weeks after the passing of Hurricanes Irma and Maria.

Likewise, plaintiffs have not shown that the information contained in Exhibit 233 cannot be presented in an admissible form at trial.  An objection as to the admissibility of evidence must "not [be] that the material 'has not' been submitted in admissible form, but that it 'cannot' be." S.E.C. v. Ramírez, 2018 WL 2021464, *6 (D.P.R. Apr. 30, 2018)(internal citations omitted); Parker Waichman LLP v. Salas LC, 320 F.Supp.3d 327, 332 (D.P.R. 2018)(similar).

Exhibit 233 contains information on who prepared the report, and this individual could be called as a witness at trial in order to testify about the content of the report and be crossed examined by plaintiffs.  As such, a district court "may consider hearsay evidence submitted in an inadmissible form at the summary judgment stage where the content of the evidence proffered could later be provided in an admissible form at trial." S.E.C. v. Ramírez, 2018 WL 2021464 *6 (citing S.E.C. v. Strategic Global Investments, Inc., 262 F.Supp.3d 1007, 1019 (S.D. Cal. 2017)(citing in part, JL Beverage Company, LLC v. Jim Beam Brands Co., 828 F.3d 1098, 1110 (9th Cir. 2016) and Fed. R. Civ. P. 56(c)(2) committee's note to 2010 amendments)).  That is the case here.

### 3. **Rule 30(b)(6)**

Plaintiffs contend that Exhibits 229 and 233 should be stricken from the record pursuant to Fed.R.Civ.P. R. 30(b)(6) (Docket No. 92, p.4).  According to plaintiffs, defendant did not comply with its discovery obligations when it failed to "produce a witness or identify persons with knowledge who could attest" to the damages suffered by the hotel.  Id.  The court agrees with defendant that (1) Ms. Volkart testified in her deposition about her personal knowledge regarding the damages caused by Hurricane Maria, among other relevant facts (Docket No. 87, Exhibit 71 at pp. 32-64) and (2) Exhibit 233 contains information about the individual who prepared the report – Dennis A. Di Milo from DBI Construction Consultants – and plaintiffs could have subpoenaed Mr. Di Milo or DBI but did not do so.  Those two facts defeat plaintiffs' contention regarding Rule 30(b)(6).

### B. **Law 80**

Plaintiffs allege that they were terminated without just cause under Law 80 (Docket No. 1, Exhibit 1, at ¶¶ 4-5).  The statute makes private sector employers liable for an indemnity to employees hired for undefined term who are discharged without just cause.  See, Article 1 of Law 80, P.R. Laws Ann. tit. 29 § 185a (stating coverage and payment obligation).  Along this line, Article 2 provides that just cause consists of "that which is not based on legally prohibited reasons and on a whim of the employer."  Id. at § 185b.  Moreover, it comprises "such reasons that affect the proper and regular operations of the establishment, including, among others: … (d) the full, temporary, or partial closing of the operations of the establishment."  Id.  Establishment means "the geographic or physical site or location where an employer operates a business or company."  Id. at § 185n(f).  A permanent closing is one lasting over six months.  See, "Revised Guidelines for the Interpretation and Implementation of Law No. 80 of May 30, 1976, as Amended, (June 30,

2014)," issued by the Puerto Rico Department of Labor and Human Resources, p. 56 (addressing topic).[11]

As to employees discharged under § 185b(d), Article 3 of Law 80 imposes upon the employer the obligation to retain employees of greater seniority on the job provided there are vacant positions or positions filled by employees of less seniority within the same "occupational classification." P.R. Laws Ann. tit. 29 § 185c. Further, Article 3 states that in the event the employer hire workers within six months after the discharge to occupy positions in the affected occupational classifications, it must give preference by seniority to the employees that occupied those positions at the time of the discharge. Id. Seniority need not be followed in discharging or rehiring employees pursuant to this provision if there is a reasonably clear or evident difference in favor of the capacity, productivity performance, competence, efficiency or conduct record of the less senior employee, in which case the employer may make a selection based on such criteria. Id.

Before the enactment of LTFA, plaintiffs bore the initial burden of alleging unjustified dismissal and of proving termination. See, García-García v. Costco Wholesale Corporation, 878 F.3d 411, 420 (1st Cir. 2017)(describing framework). If this requirement was met, the employer had to come forward with evidence to prove that the discharge was justified. Id. In the event the employer did so, plaintiff had to rebut the showing of just cause. Id. The LTFA, however, relieved the defendant of the obligation to prove just cause for the discharge. See, Article 4.12 (amending Article 11 of Law 80 to this effect).[12] If the discharge is considered just, "no discharge indemnity

---

[11] The Spanish-language title of the guidelines is, "Guía Revisada para la Interpretación y Aplicación de la Ley Núm. 80 de 30 de mayo de 1976, según enmendada," (30 de Junio de 2014). The Guidelines have been treated as "informative" by the First Circuit and this court. Otero-Burgos v. Inter American University, 558 F. 3d 1, 9 (1st Cir. 2009). Also, they have been cited by the Puerto Rico Supreme Court. See, Segarra-Rivera v. International Shipping Agency, 2022 TSPR at 29, n. 86 (citing the Guidelines).

[12] The employer's burden to show just cause was part of Article 11 of Law No. 80. See, Alvarez-Fonseca v. Pepsi Cola of Puerto Rico Bottling Co., 152 F.3d 17, 28 (1st Cir. 1998)(discussing burden).

payment is due" and the claim "must be dismissed." Gonzalez-Santiago v. Baxter Healthcare S.A.,

2021 WL 1208207, *32 (D.P.R. Mar. 29, 2021).

It is uncontested that Ritz-Carlton closed its doors to the public on September 20, 2017 and

has not reopened for business.  The closing constitutes just cause for plaintiffs' discharge.[13]

Beyond that, the closing occurred on account of the damage that the hurricanes inflicted on the

property, affecting the hotel's operations, and there was no foreseeable date for reopening.  The

rationale is not whimsical, arbitrary or capricious.  Further, seniority was followed in the

terminations.  Plaintiffs were not replaced by new or less senior employees in their occupational

classifications.

Plaintiffs do not dispute that the hotel closed.  However, they state that "as a general rule the

owner has the authority" to close a business, but if the employer "[does] not provide a justified reason

for the closing" it is liable under Law 80 (Docket No. 94, p. 13).  Law 80 does not require the

employer to prove why it decided to close a site or cease operations.  The inquiry is whether there is

just cause for the discharge.  And the full, temporary or partial closing of operations is just cause for

termination under Law 80.  Once that just cause is shown, the Law 80 inquiry ends.  See, Jorge L.

Capó-Matos in M.J. Caterine, *Employment at Will: A State-by-State Survey-Puerto Rico Chapter*

(2011), p. 960 ("Demonstrating the employee's dismissal resulted from the closing of the

establishment where the worker was employed is sufficient to meet the 'just cause' requirement

under [Law 80].  The statute does not contemplate an inquiry into the employer's reasons for the

closing").[14]

---

[13] As Ritz-Carlton has some employees on board, the closing is considered "partial and permanent" under Law 80. Guidelines, *supra* at p. 56.

[14] For the same reason, just cause based on a reduction in the prevailing or foreseen volume of production, sales or profit under P.R. Laws Ann. tit. 29 § 185b(f) requires evidence of that reduction.  See, Segarra-Rivera, 2022 TSPR at 44 (so recognizing).  It is not necessary to accredit why the reduction occurred.

Plaintiffs acknowledge that the property suffered damages but suggest that those damages should not have caused the closing of the hotel (Docket No. 106, p. 30).  That is up to the employer to assess and determine.  Just cause is found where the employer had "a reasonable basis" to believe that the asserted grounds for termination occurred.  García-García, 878 F. 3d at 420.  Even a perceived problem suffices to establish that the employer did not terminate the employee on a whim, but rather for a sensible business-related reason.  Id.  The termination need only be non-arbitrary and bear some relationship to the business operation.  Id.  Here, not only was there a closing, which in itself satisfies the just cause criterion, but also a property damaged by natural disasters and no foreseeable date to reopen the hotel, itself a non-arbitrary ground for termination directly related to the employer's business.  Altogether, plaintiffs had to do more than merely "cast doubt on the defendant's proffered reason for his discharge.  Id. at 421.  And they did not do so.  The hotel closed for business and has not reopened.  In consequence, the Law 80 claim must be dismissed.

### C.  Law No. 100

In the Complaint, plaintiffs allege that Ritz-Carlton discriminated against them because of their age in violation of Law 100 (Docket Nos. 1, ¶ 61; 180, ¶¶ 49-51).  Ritz-Carlton moved for summary judgment as to this contention (Docket No. 86, p. 78).  Plaintiffs, however, failed to address Law 100 in opposing summary judgment or in sur-replying to Ritz-Carlton's reply to plaintiffs' opposition (Docket Nos. 94 and 110).  Even an issue "raised in the complaint but ignored at summary judgment may be deemed waived."  Grenier v. Cyanamid Plastics, Inc., 70 F.3d 667, 678 (1st Cir. 1995); Nieves Domenech v. Dymax Corp., 952 F.Supp.57, 65 (D.P.R. 1996)(similar).  With the waiver, plaintiffs must be held to have conceded that there is no merit to the Law 100 claim.  Notwithstanding, for their benefit, the court addresses the merits of this claim.

Law 100 prohibits discrimination in employment because of various characteristics, including age.  See, P.R. Laws Ann. tit. 29 § 146 (setting forth prohibition).  Until the enactment of the LTFA, in the absence of direct evidence of discrimination a plaintiff could rely on circumstantial evidence through the "just cause" framework set in Article 3 of the statute.  P.R. Laws Ann. tit. 29 § 148.  At its core, the framework consisted of three stages: (1) a *prima facie* case; (2) burden shifting; and (3) ultimate demonstration of discrimination.  See, Caraballo-Cecilio v. Marina PDR Tallyman LLC, 2016 WL 6068117, *2 (D.P.R. Oct. 13, 2016)(describing framework).

A plaintiff established a *prima facie* case by demonstrating that: (1) he suffered an adverse employment action; (2) the adverse action lacked just cause; and (3) some basic fact substantiating the type of discrimination alleged.  See, Rodríguez v. Executive Airlines, Inc., 180 F.Supp.3d 129, 132-133 (D.P.R. 2016)(setting forth elements of *prima facie* case under Law No. 100); Varela-Teron v. Banco Santander de Puerto Rico, 257 F.Supp.2d 454, 466 (D.P.R.2003)(same).  A *prima facie* showing activated a presumption that the plaintiff was the victim of discrimination.  See, García-García, 878 F.3d at 423 (pointing out effect of presumption); Ramos v. Davis & Geck, Inc., 167 F.3d 727 (1st Cir. 1999)(similar).  The term "just cause" was construed by reference to Law 80.  See, Rodríguez, 180 F.Supp.3d at 133 (so recognizing).

The employer could rebut the presumption proving legitimate, non-discriminatory grounds for the challenged action.  See, De Arteaga v. Pall Ultrafine Filtration Corp., 862 F.2d 940, 941 (1st Cir. 1988)(noting that once activated, the presumption required employer to prove that the action in question was not discriminatory); Ramos-Santiago v. WHM Carib, LLC, 2017 WL 1025784, *6 (D.P.R. March 14, 2017)(describing among other things, how employer could rebut

the presumption).  The burden was one of production and of persuasion.  See, García-García, 878

F.3d at 423 (explaining the Law No. 100 burden).

If the employer satisfied this burden, the presumption of discrimination "disappeared,"

shifting to the employee the burden of proof on the ultimate issue of discrimination, meaning that

he had to prove that the reasons proffered for the termination were a pretext specifically designed

to mask the asserted discrimination.  García-García, 878 F.3d at 423.  The same burden persisted

in cases where the presumption was not triggered, as in those instances the employee also had the

burden of proof on the final issue of discrimination.  Id. at 424 n. 22.

The LTFA amended Article 3 of Law 100, eliminating the presumption.  See, Article 6.3

of LTFA (amending Article 3 of Law 100).  Plaintiffs have not presented direct evidence of

discrimination.  Ritz-Carlton treated age neutrally.  It laid off and discharged employees in all age

groups.  It did not retain or hire younger employees to substitute older- or younger -employees in

their jobs.  Moreover, plaintiffs could not even prevail under the pre-LTFA just-cause presumption

framework, which is more favorable to plaintiffs than the one resulting from the LTFA.  As

discussed in relation to Law 80, the record demonstrates just cause to terminate plaintiffs'

employment, from which follows that the presumption was not set in motion.  In line with García-

García and the pre-LTFA framework, the case would move one step further, in order to allow

plaintiff to try to demonstrate that the reasons proffered for their termination are a pretext to cover

up age animus.

Pretext may be found where there are "such weaknesses, implausibilities, inconsistencies,

incoherencies, or contradictions" in an employer's proffered reasons for termination "that a

reasonable factfinder could rationally find them unworthy of credence and hence infer that the

employer did not act for the asserted non-discriminatory reasons."  Bonefont-Igaravidez v.

International Shipping Corp., 659 F.3d 120, 124 (1st Cir. 2011).  Plaintiffs have not directed the

court's attention to any such weaknesses, implausibilities, inconsistencies, or contradictions here,

and the court has found none.  The record is devoid of proof that Ritz-Carlton invoked the grounds

mentioned earlier as an excuse to conceal prohibited discrimination.  The company has been

consistent in the explanation that it has presented for its actions – the hotel closed as a result of the

damages caused by the hurricanes and there was no foreseeable date for reopening the property

for business.  Compare with, Collazo-Rosado v. University of Puerto Rico, 765 F.3d 86, 93 (1st

Cir. 2014)(one way to establish pretext is to show that employer gave different and arguably

inconsistent explanations for its action, unless the record conclusively reveals that the real motive

was an unstated, but legitimate reason); Wierman v. Casey's General Stores, 638 F.3d 984, 995-

996 (8th Cir. 2011)(discrepancy on documented reasons for plaintiff's termination immaterial

where the underlying reason remains consistent).[15]

   Plaintiff Bernard I. Sánchez Bisbal alleges that his age discrimination allegation is limited

to an employee named Zunidmari, although he does not know her age or have access to her

personnel file or birth certificate.  See, SUMF (Docket No. 87) at ¶ 840.  He maintains that,

although no GSCC agent with less seniority than him was kept on the job, Zunidmari was left in

charge of answering the phone calls that came into the hotel, which was one of the tasks that he

had performed.  See, SUMF (Docket No. 87) ¶¶ 593 and 594.  However, he admitted that

---

[15] Along the same line, compare Rademacher v. HBE Corp., 645 F.3d 1005, 1007, 1011-1012 (8th Cir. 2011)(dismissing discrimination claim in part because the employer's reasons for its decision did not vary); Serrano v. Donahoe, 2014 WL 4924434, *6 (D.P.R. Sept. 30, 2014)(dismissing discrimination claim where record showed consistency in the asserted basis for the employer's decision); Taylor v. Got Beer, Inc., 2007 WL 9754086, *5 (N.D. Ala. Aug. 22, 2007)(dismissing discrimination claim where legitimate, nondiscriminatory reason articulated by employer did not change), with Vélez v. Thermo King de Puerto Rico, Inc., 585 F.3d 441, 449 (1st Cir. 2009)(finding pretext in part because the employer did not initially provide plaintiff with any reason for firing him, one month later, the company's human resources director told the EEOC and the ADU that plaintiff had been fired for violating the company's policy on receiving gifts from suppliers, and in responding to the lawsuit over a year later, the company said for the first time that plaintiff had been fired for stealing and selling company property).

Zunidmari held a position in the Sales Department – she is a Sales Administrative Assistant – and that the only duty that she was allegedly carrying out, which he also performed as GSCC agent, was answering the switchboard.  Id. at ¶¶ 332, 594 and 595.  Zunidmari was not left to replace Mr. Sánchez.  A discharged employee "is not replaced" when another employee is assigned to perform the plaintiff's duties in addition to other duties or when the work or some of the work is redistributed among other existing employees.  Pages-Cahue v. Iberia Líneas Aéreas de España, 82 F.3d 533, 539 (1st Cir. 1996).  While some Loss Prevention agents/officers were retained, it is uncontested that they had more seniority than the plaintiffs who had also held this position.  See, SUMF (Docket No. 87) at ¶ 332.

Plaintiff Samuel Torres Pérez alleges that Carmen Ramírez Álvarez and Benjamín Nieves were left performing his duties as Loss Prevention Supervisor.  See, SUMF (Docket No. 87) at ¶ 671.  Plaintiff César R. Merced Torres also identified Ms. Ramírez as an individual he believes was kept at the Ritz-Carlton to perform his duties as Loss Prevention Supervisor.  Id. at ¶ 677.  However, Mr. Nieves is a Loss Prevention agent/officer whereas Ms. Ramírez is a Casino Surveillance Supervisor.  Id. at ¶¶ 332, 666 and 672.  Ritz-Carlton retained them based on their occupational classifications, not their ages.  As for Ms. Ramírez, the Gaming Division of the Puerto Rico Tourism Company requires surveillance of the cage and any other areas in which chips and other gaming equipment is stored, and she had the training to do so.  Id. at ¶ 334.  In all, the Law 100 claim must be dismissed.

**D. LTFA**

Plaintiffs allege that Ritz-Carlton violated Article 3.18 of LTFA when it terminated them "with the intention that they be substituted in their positions by employees to whom it will apply the system of accrual of leaves" set forth in PR Law No. 4 (Docket No. 1, Exhibit 1, ¶¶ 21-22).

Article 3.18 provides that any employee who worked for an employer before the LTFA became effective, and who was entitled by law to monthly vacation and sick leave accrual rates higher than those set in the LTFA, shall continue to enjoy the same rates that applied prior to the LTFA's enactment.   Additionally, under Article 3.18, the employer commits an unlawful employment practice if it dismisses, discharges, or indefinitely suspends an employee who worked for it before the effective date of the LTFA for the purpose of rehiring or replacing the employee with a new worker in order to avail itself of the lower sick or vacation leave accrual scheme provided for by the statute.

Article 3.18 does not prohibit employment terminations, but terminations with the purpose of rehiring or substituting the dismissed employee in order for the employer to benefit from the LTFA's lower leave accrual scheme.   And there is no evidence that Ritz-Carlton terminated any plaintiff employment with the intention of substituting them with an employee who would be covered by the leave accumulation scheme set in the LTFA.   The record shows that Ritz-Carlton has not replaced plaintiffs with any other employee (Docket No. 86, at pp. 79-80).   The hotel remains closed for business.   On this basis, the LTFA claims must be dismissed.

**E.   WARN Act**

Plaintiffs allege Ritz-Carlton violated the WARN Act (Docket No. 1, Exhibit 1, ¶¶ 23-24). The statute requires, in part, that employers provide affected employees with at least 60 days' advance notice of a "plant closing" or "mass layoff."  29 U.S.C. § 2102(a).  A plant closing consists of "the permanent or temporary shutdown of a single site of employment, or one or more facilities or operating units within a single site of employment" if the shutdown results in an employment loss for 50 or more employees at the site during any 30-day period.  29 U.S.C. § 2101(a)(2).  A mass layoff is "a reduction in force" which is not the result of a plant closing but that results in an

employment loss at the single site of employment during any 30-day period for at least 33 percent of the employees, at least 50 employees, or at least 500 employees.  Id. at § 2101(a)(3).[16]

An affected employee is an employee "who may reasonably be expected to experience an employment loss as a consequence of a proposed plant closing or mass layoff." Id. at. § 2101(a)(5). Employment loss means "(A) an employment termination, other than a discharge for cause, voluntary departure, or retirement; (B) a layoff exceeding six months; or (C) a reduction in hours of work of more than 50 percent during each month of any 6- month period." Id. at § 2101(a)(6).

Failure to give required notice results in employer liability to each terminated employee for backpay and benefits "for each day in which notice should have been given." Id. at § 2104(a). By exception, no notice is required "if the plant closing or mass layoff is due to any form of natural disaster." Id. at § 2102(b)(2)(B).  The term "natural disaster" includes "[f]loods, earthquakes, droughts, storms, tidal waves or tsunamis and similar effects of nature." 20 C.F.R. § 639.9(c). Hurricanes Irma and María fall under this category.

Plaintiffs posit that their termination was effective on April 30, 2018, for which they received a notification on March 19, 2018 (41 days prior to the effectiveness of the termination). They state that Ritz-Carlton violated the statute and must compensate them with 19 days-worth of salaries and benefits, plus attorney's fees (Docket No. 1, Exhibit 1, ¶¶ 24-25).  On November 17, 2017, Ritz-Carlton issued WARN notices to its employees informing them of their layoffs effective October 6, 2017, as a consequence of damage to the hotel resulting from the hurricanes (Docket No. 87-231, p. 1).  It was reasonable for Ritz-Carlton to so inform the employees, albeit 29 U.S.C. § 2102(b)(2)(B) did not require notice.  See, Sides v. Macon Cty. Greyhound Park, Inc.,

---

[16] These definitions exclude "part-time employees."  29 U.S.C. § 2101(a)(2) and (3).  The term "part-time employee" means "an employee who is employed for an average of fewer than 20 hours per week or who has been employed for fewer than 6 of the 12 months p receding the date on which notice is required." Id. at § 2101(a)(8).

725 F.3d 1276, 1285 (11th Cir. 2013)(noting that § 2102(b)(2)(B) lists circumstances under which no WARN Act notice is required); In re Dewey & LeBoeuf, LLP, 507 B.R. 522, 531 n. 10 (Bankr. S.D. N.Y. 2014) (§ 2102(b)(2)(B) "dispenses with the notice requirement altogether in the event of a natural disaster"); Torres v. Niche, Inc., 2013 WL 6655415, *2 (D. Mass. Dec. 19, 2013)("The WARN Act gives an employer a complete exception in the event of a natural disaster").

The layoffs were to continue in effect while Ritz-Carlton evaluated the extent of the damages caused by the hurricanes, and until it was able to determine when the hotel would reopen its doors and continue with its normal operations (Docket No. 87-231, p. 1). Plaintiffs' last day of work was September 20, 2017. The March 2018 notice came about six months later, when it became foreseeable that the layoffs could exceed six months. See, SUMF (Docket No. 87) ¶¶ 316, 318, and 321. Because those terminations derived from the hurricanes, no 60-day advance notice was necessary. Nevertheless, in providing the termination notices in March 2018, Ritz-Carlton complied with the WARN notice framework. And if there was an advance-notice violation, the 19-day deficit would have been covered by the 32-hour weekly payments that plaintiffs received from September 20, 2017, to December 14, 2017; the April 12, 2018, payment; and the health-plan coverage that Ritz-Carlton provided to the employees up to March 31, 2018. See, SUMF (Docket No. 87) at ¶¶ 24-28.[17] Therefore, the WARN claim must be dismissed.

## IV.    CONCLUSION

For the reasons stated, the motion for summary judgment (Docket No. 86) is GRANTED the motion to strike exhibits of defendant's proposed statement of uncontested facts (Docket No. 92) is DENIED, and the case is DISMISSED. Judgment shall be entered accordingly.

---

[17] From the record, these were voluntary and unconditional payments not required by any legal obligation.

**SO ORDERED.**

In San Juan, Puerto Rico, this 31st day of March, 2022.

s/Pedro A. Delgado Hernández
PEDRO A. DELGADO HERNÁNDEZ
United States District Judge